NO. 07-11-0065-CV

IN THE COURT OF APPEALS

FOR THE SEVENTH DISTRICT OF TEXAS

AT AMARILLO

PANEL D

SEPTEMBER 28, 2011
_____

AMERICAN PREFERRED SERVICES, INC.,

Appellant

v.

LADELL HARRISON, ON BEHALF OF MATTHEW C. ALLEN, JR.,
TEDDIE J. ALLEN, AND THE MATTHEW AND TEDDIE ALLEN
CHARITABLE REMAINDER ANNUITY TRUST, ET AL.,

Appellees
_____

FROM THE 181ST DISTRICT COURT OF RANDALL COUNTY;

NO. 62,365-B; HONORABLE JOHN B. BOARD, PRESIDING
_____

*Memorandum Opinion*
_____

Before QUINN, C.J., and CAMPBELL and PIRTLE, JJ.

American Preferred Services, Inc. (APS) appeals the trial court's order denying its special appearance in a lawsuit filed by Matthew C. Allen, Jr. and Teddie J. Allen (the Allens) and various trusts against APS (and others) asserting claims of misrepresentation and the violation of the Texas Securities Act. According to APS, it is not subject to personal jurisdiction in Texas, and the trial court erred in holding otherwise. We affirm.

*Background*

In 2002, the Allens, who resided in Memphis, Texas, sought estate planning services, mentioned that to their insurance agent Frank Bice, and subsequently received communications from Lawrence Rasche. Living in Indiana, Rasche traveled to Texas to meet with the Allens and discuss various planning options, including the creation of a charitable remainder annuity trust. The Allens found the latter of interest, and this resulted in Rasche contacting APS.

George Brown, the president of APS, had worked with Doug Houk of the National Heritage Foundation (NHF) "in the charitable arena for some time." Though the record fails to disclose whether Brown induced Houk or NHF to create a charitable annuity program (program), "APS [was] involved with NHF's . . . annuity program from its inception . . . ." APS also served as the program's "administrator," a relationship APS displayed on its letterhead. As administrator, it "implement[ed] the gift annuities for" NHF. That task included, but was not limited to, 1) the creation of brochures marketing the program, 2) the preparation of income flow "illustrations" to be used by salesmen (such as Rasche) to induce prospective clients into contracting with NHF,[1] and 3) the creation of documents needed by a client to "implement" an annuity, such as the application form and actual agreement.

More importantly, the corporate representative of APS testified that NHF was not involved in the application or agreement process itself. Rather, the record discloses that APS, on behalf of NHF and through individuals such as Rasche would 1) provide the marketing data to the prospective annuitants, 2) secure the execution of the written

---

[1]APS, as opposed to NHF, owned the requisite software.

application and agreement, 3) receive the annuitants' lump sum payment for the annuity as well as the executed application and agreement, and 4) forward the application, agreement, and payment to NHF with directions regarding the monthly annuity installment NHF became obligated to pay and the monthly payment date. The same corporate representative also stated that "if annuitants, for example, needed some kind of service, if they moved and changed their address or if they wanted to have their checks electronically deposited . . . or something like that, they might call us for that."

This evidence does more than merely suggest that APS acted as a representative of NHF. Coupling the ability to issue an application, secure an executed agreement, and receive payment from a prospective client all without input from NHF with the power to then inform NHF to pay a sum certain at a time certain connotes an authority to bind NHF.

The aforementioned procedure was utilized in the case at bar. APS garnered relevant data about the Allens from Rasche, and prepared income projections, an annuity agreement, and an application for them to consider and execute. Rasche received those documents from APS and delivered them to the Allens. The latter, upon reviewing the data generated by APS, agreed to and ultimately consummated the annuity transaction. And, per the directive of APS, all the required documents and payment for the annuity were returned to APS. At that point, APS informed NHF of its obligation to send a specific monthly annuity payment to the Allens by a specific day of the month. Furthermore, those payments were sent for a number of years but stopped when NHF sought Chapter 11 bankruptcy protection. And, though a large portion of their initial capital was returned to them via the bankruptcy proceeding, the Allens sued

3

to recover damages arising from misrepresentations and omissions contained in the documentation generated and supplied by APS.

*Analysis*

From the information of record, one can reasonably infer that the claims urged by the Allens arose from the particular economic transaction described above. Admittedly, APS had no offices or employees in Texas. Yet, it worked with an intermediary who travelled to that state to engage in a business transaction. Furthermore, APS not only knew that the intermediary was conducting business in Texas but also purposefully created the documents it knew were needed to consummate a deal in Texas between a company it represented and Texas residents. Some of those very documents were not generic but rather specific to the Allens and their situation. In reliance on them and their contents, the Texas residents completed the transaction, and the paperwork and payment were sent to APS, which company apparently accepted the obligation on behalf of NHF. However, APS did not intend or expect its involvement to end there. As the administrator of NHF's program, it stood ready to perform other services needed by "annuitants" such as the Allens and related to performance of the annuity agreement. Simply put, APS' decision to mingle with Texas residents over the long term was not simply fortuitous.

Another inference that one could reasonably derive is that APS expected to reap financial gain through its interaction with the same Texas residents. Again, it agreed to act as the program's administrator and received compensation for that. A portion of that compensation came from the Allens via receipt of its percentage or share of the annuities purchase price.

4

The Texas Supreme Court reiterated of late that personal jurisdiction over a non-resident may arise from the execution of one contract, but not if that contract encompassed only one contact. *Retamco Operating, Inc. v. Republic Drilling, Inc.*, 278 S.W.3d 333, 339-40 (Tex. 2009); *Michiana Easy Livin' Country, Inc. v. Holten*, 168 S.W.3d 777, 787 (Tex. 2005) (stating that it "is true that in some circumstances a single *contract* may meet the purposeful-availment standard . . . [a] long-term franchise agreement may establish minimum contacts because, though it stems from a single contract, it involves many contacts over a long period of time. Similarly, a life-insurance policy may stem from a single contract, but necessarily involves a series of contacts until death does the parties part"). Furthermore, it is not necessary that the non-resident appear on Texas soil for the one contract to suffice. *Retamco Operating, Inc. v. Republic Drilling, Inc.,* 278 S.W.3d at 339-40, *quoting Burger King Corp. v. Rudzewicz,* 471 U.S. 462, 105 S.Ct. 2174, 85 L.Ed.2d 528 (1985) (stating that "'[j]urisdiction . . . may not be avoided merely because the defendant did not physically enter the forum state.'") What must be shown (under the theory of jurisdiction invoked here) is that the non-resident purposefully availed itself of the privilege of conducting activities in Texas, the cause of action relates to or arises from those activities, and the exercise of jurisdiction over the non-resident comports with traditional notions of fair play and substantial justice. *Id.* at 339-41. The evidence of record permitted the trial court to legitimately conclude that the first two criteria were met.

As for the third indicia, seldom will the exercise of personal jurisdiction over a non-resident offend traditional notions or fair play and substantial justice "when the nonresident defendant has purposefully established minimum contacts with the forum

state." *Id.* at 342.  Such contacts exist here.  And, much as it does not offend such notions to exercise jurisdiction when an insurance contract is involved, *McGee v. Internationall Life Ins. Co.*, 355 U.S. 220, 223-24, 78 S.Ct. 199, 201, 2 L.Ed.2d 223 (1957), the same should be no less true when the dispute concerns an annuity.  Both arise from a single contract wherein the parties foresee or expect a long-term relationship.  To quote the writing in *McGee:*

> It cannot be denied that [a state] has a manifest interest in providing effective means of redress for its residents when their [annuity companies] refuse to pay claims. These residents would be at a severe disadvantage if they were forced to follow . . .  [such companies] to a distant State in order to hold it legally accountable. When claims were small or moderate[,] individual claimants frequently could not afford the cost of bringing an action in a foreign forum -- thus in effect making the company judgment proof. Often the crucial witnesses -- as here on the company's defense of suicide -- will be found in the [company's] locality.  Of course there may be inconvenience to the [company] if it is held amenable to suit in [Texas] where it had this contract but certainly nothing which amounts to a denial of due process.

*Id.*

It may well be that the actual annuity contract was not between the Allens and APS.  But, when the evidence indicates that APS acted as NHF's administrator, performed the requisite steps to secure a binding contract, knew it was dealing with Texas residents, knowingly reaped financial benefit from interacting with the Allens, and expected to perform any ministerial duties related to the contract and needed by either NHF and the Texas residents, the absence of an actual contractual relationship between the plaintiff and defendant is of minimal effect.

Because we conclude that the trial court did not err in denying the special appearance of APS, we overrule the issue before us and affirm the trial court's decision.


Brian Quinn
Chief Justice